UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. |
| Plaintiff, ) | |
| ) | Judge |
| vs. ) | |
| ) | |
| FUNDS IN THE AMOUNT OF $10,000 ) | |
| IN UNITED STATES CURRENCY, ) | |
| ) | |
| Defendant, *In Rem*. ) | |

**VERIFIED COMPLAINT FOR FORFEITURE, *IN REM***

COMES NOW, before this honorable Court, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to the provisions of Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Fed. R. Civ. P. Supp.") G(2), respectfully, to bring this Verified Complaint for Forfeiture *In Rem*.

Plaintiff hereby alleges as follows:

**Nature of the Action**

1. This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2. This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3. This civil action *in rem* is brought to forfeit property pursuant to the provisions of 21 U.S.C. § 881(a)(6), 18 U.S.C. §§ 981(a)(1)(A), and 981(a)(1)(C), because it: (1) was involved in, (2) was used or intended to be used to facilitate, (3) was furnished or intended to be furnished in

exchange for, or (4) is proceeds (or property) traceable to, a "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7)(A).

4. Based upon the facts and circumstances herein set forth, Plaintiff prays: (1) that process issue for an arrest warrant *in rem* for the subject property; (2) that notice be given to all parties to appear and show cause why forfeiture should not be decreed; (3) that this Court enter a judgment of forfeiture to the United States; and (4) that this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

5. This complaint is verified by the attached Verification of Drug Enforcement Administration ("DEA") Task Force Officer Scott M. Opelt ("TFO Opelt"), which is fully incorporated herein.

## The Defendant *In Rem*

6. The Defendant *in rem* consists of the following property:

- $10,000 (ten thousand dollars) in United States currency.

(Hereinafter, the "subject property").

7. The subject property was seized on September 5, 2018, by the DEA Chicago Field Division Enforcement/Interdiction Group 24 Task Force ("Group 24") operating out of O'Hare International Airport in Chicago, Illinois ("O'Hare"), to which TFO Opelt is assigned.

8. The subject property is currently in the custody of the United States Marshals Service.

## Jurisdictional Statement

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345 because this action is commenced by the United States of America, and pursuant to 28 U.S.C. § 1355(a) because this is an action for forfeiture.

10. This Court has *in rem* jurisdiction over the subject property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395(a) (via 28 U.S.C. § 1355(b)(1)(B)) because the subject property is located in this district.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 (via 28 U.S.C. § 1355(b)(1)(B)) because the subject property is located in this district.

**Basis for Forfeiture**

12. The subject property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq.* (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

13. The subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, "dealing in a controlled substance" under 18 U.S.C. § 1961(1)(A) and "interstate and foreign travel or transportation in aid of racketeering enterprises" under 18 U.S.C. § 1952 – "specified unlawful activate[ies]" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

14. The subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from "proceeds traceable" to "dealing in a controlled substance" under 18 U.S.C. § 1961(1)(A) and "interstate and foreign travel or transportation in aid of racketeering

enterprises" under 18 U.S.C. § 1952 – "specified unlawful activit[ies]" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

## Summary of Facts

15. On September 5, 2018, members of DEA Group 24 conducted a consensual interview and search at O'Hare, which led to the discovery and seizure of the subject property from Nathanial John Wilczewski ("Wilczewski"), who was traveling with other passengers together on round trip tickets via American Airlines® flight 2611 from Chicago, Illinois to Los Angeles, California.

16. A police canine certified by the Chicago Police Department demonstrated as a positive alert on the subject property, indicating the presence of one of five odors he is trained to detect.

17. Based upon the experience of DEA Group 24 officers, including TFO Opelt, and the totality of the circumstances further described below, the subject property was seized for forfeiture.

## Facts

I. Airport Interdiction and Discovery of the Subject Property

    A. Overview of DEA Group 24 at O'Hare

18. This Complaint describes an investigation conducted by members of DEA Group 24 at O'Hare, to which TFO Opelt is a member.

19. The primary responsibility of Group 24 is to investigate crimes involving the use of public train stations, commercial airlines, and shipping companies to transport illegal drugs and drug proceeds.

20. Based upon the experience of Group 24 investigators and in similar investigations across the United States, it is common knowledge that cities in the mid-west and east coast are demand

locations for illicit drugs.

21. States such as Arizona, California, and Colorado are considered source locations due to their close proximity to the border of Mexico and established drug transportation routes.

22. Person(s) involved in the illegal drug trade, often hire couriers to transport drugs and or proceeds from the sale of drugs by utilizing public train stations, commercial airlines, and shipping companies.

23. In an effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious travel itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

24. Factors that constitute suspicious travel itineraries include ticket purchase at the counter immediately prior to departure or short notice reservations for one-way travel, sometimes paid in cash.

25. In addition, Group 24 investigators know that it is common for couriers to utilize a third-party credit card to purchase tickets and to provide inaccurate or not in-service telephone numbers to airline and other transit companies.

26. Couriers often travel with minimal luggage and routinely attempt to board at the last possible moment.

27. Drug and/or money couriers utilize these techniques in an attempt to conceal their identities from law enforcement and minimize their exposure to commercial airlines and passenger railroad services.

  B. Travel Itinerary and Suspicious Behavior of American Airlines® Passengers Rafael Delgado ("Rafael"), Rafael Quinonez ("Quinonez"), and Adan Delgado ("Adan")

28. On September 5, 2018, law enforcement officers assigned to Group 24 were alerted to the suspicious travel itinerary of American Airlines® passengers Rafael and Quinonez.

29. Rafael and Quinonez were traveling together on round trip tickets via American Airlines® flight 2611 from Chicago, Illinois to Los Angeles, California.

30. The tickets were purchased on September 4, 2018, thirty minutes apart, with the same telephone number on each reservation.

31. The tickets had a return flight scheduled for the next day on September 6, 2018.

32. Based upon the training and experience of Group 24 investigators, illegal drug couriers often purchase airline tickets one day or so prior to the scheduled departure.

33. Group 24 investigators also know Los Angeles, California, and the central California region in particular, to be a known source area for illegal drug trafficking.

34. Further, Group 24 investigators also know that those who transport illegal drugs, or the proceeds of illegal drug trafficking, often keep them on their person or in accompanying bags or suitcases.

35. The agents learned that Rafael and Quinonez had extensive criminal histories, including narcotic violations.

36. Group 24 investigators sought to conduct a consensual interview of Rafael and Quinonez prior to boarding American Airlines® flight 2611.

37. Agents obtained photographs of both Rafael and Quinonez prior to the interview.

38. At approximately 1:30 p.m., Group 24 investigators established surveillance near gate H-10 at O'Hare, the gate for the outbound American Airlines® flight 2611, in an attempt to interview Rafael and Quinonez.

39. Investigators were dressed in civilian clothing with no weapons, radios, or other law enforcement paraphernalia visible.

40. Shortly thereafter, TFO Opelt observed two male subjects matching the description and photo likenesses of Rafael and Quinonez.

41. Rafael and Quinonez appeared to be with a third male subject, later identified as Nathanial Wilczewski ("Wilczewski").

42. The agents believed the two males were with Wilczewski because Rafael approached Wilczewski and handed him a small black backpack.

43. Rafael, Quinonez, and Wilczewski spoke briefly with one another; then Rafael and Quinonez proceeded to the restroom while Wilczewski waited by the gate.

44. Upon exiting the restroom, Rafael and Quinonez began walking toward gate H-10.

45. At this time, Task Force Officer Amy Jenkins ("TFO Jenkins") proceeded to have a consensual interview with Rafael after identifying herself as a law enforcement officer.

46. During the course of the interview with Rafael, agents performed a consensual search of Rafael's luggage.

47. A total of $10,000 in U.S. currency was discovered in Rafael's luggage.

48. Rafael initially advised that the money was to be spent during his trip to in California, but when confronted with the fact that his trip was only overnight, he changed his story and advised that he was buying a car.

49. Separately, and also after having identified himself as a law enforcement officer, Task Force Officer Anthony Terranova ("TFO Terranova") proceeded to have a consensual interview with Quinonez.

50. During the course of the interview with Quinonez, agents performed a consensual search of Quinonez's luggage.

51. A total of $10,000 in U.S currency was discovered in Quinonez's luggage.

52. Quinonez became argumentative and refused to provide an answer when asked what his purpose was for transporting the U.S. currency.

53. At approximately 1:45 p.m., agents observed a fourth male, later identified as Adan, arrive at gate H-10 and walk towards Rafael.

54. Rafael stated that Adan was his cousin.

55. Rafael then handed Adan a black carry-on bag, which Adan subsequently claimed to be his own.

56. Special Agent Dorothy Sells ("SA Sells") proceeded to have a consensual interview with Adan after identifying herself as a law enforcement officer.

57. During the course of the interview with Adan, agents performed a consensual search of Adan's luggage.

58. A total of $9,900 in U.S. currency was discovered in Adan's luggage.

59. Adan advised that he was transporting the U.S. currency with him to party in California, but refused to elaborate when asked to explain in greater detail.

    C. Initial Interview with American Airlines® Passenger Wilcezewski

60. While still holding Rafael's backpack and waiting by the gate for Rafael and Quinonez to return from the restroom, TFO Opelt approached Wilczewski, identified himself as a law enforcement officer by displaying his credentials and badge, and asked to speak with him.

61. TFO Opelt informed Wilczewski that he was not under arrest and that he was not in any trouble.

62. Wilczewski stated that he understood and agreed to speak with TFO Opelt.

63. When TFO Opelt requested to see Wilczewski's boarding pass and identification, Wilczewski produced a state of California driver's license and a boarding pass.

64. TFO Opelt noted the information contained on the documents and immediately returned them to Wilczewski.

65. When asked where he was traveling, Wilczewski stated that he was going to Los Angeles.

66. When asked for the purpose of his travel, Wilczewski stated he was traveling with friends to hang out.

67. When TFO Opelt asked Wilczewski how long he intended to be in Los Angeles, Wilczewski stated one or two days.

68. When TFO Opelt asked Wilczewski if he had any checked luggage, he replied "[n]o."

69. When TFO Opelt asked Wilczewski if the small black backpack on his back and the backpack in his hand were the only items with which he was traveling with to Los Angeles, Wilczewski stated that the backpack in his hand belonged to Rafael.

70. When TFO Opelt asked Wilczewski if the agents could return the backpack to Rafael, Wilczewski agreed.

71. SA Sells carried the backpack to Rafael, which, as alleged above, was subsequently found to contain $10,000 in U.S. currency.

72. When TFO Opelt asked Wilczewski whether anyone had asked him to carry, bring, or hold anything for him during his travel, he said "[n]o."

73. Wilczewski stated that he had packed his own luggage.

74. When TFO Opelt asked Wilczewski if he was carrying any electronic devices, liquids, weapons, illegal drugs, or large amounts of currency, he answered "[n]o" to all.

    D. Consensual Search and Discovery of the Subject Property

75. In order to verify his statements, TFO Opelt asked Wilczewski for permission to search his small black backpack.

76. At this time, Wilczewski gave oral consent to search his luggage.

77. TFO Opelt then searched Wilczewski's small black backpack and discovered the subject property - two rubber-banded bundles of U.S. currency.

78. The subject property consisted of 7 one hundred-dollar bills, 4 fifty-dollar bills, and 455 twenty-dollar bills.

79. When TFO Opelt asked Wilczewski about the U.S. currency, Wilczewski stated that he was only carrying $10,000, which he believed to be under the limit to require declaration.

80. TFO Opelt advised Wilczewski that the rule is only for international travel, and there is no declaration required for domestic travel.

81. When TFO Opelt asked Wilczewski if he was aware of his friends carrying any currency, Wilczewski said that he was not.

82. When TFO Opelt asked Wilczewski if he had withdrawn the money from the bank, Wilczewski said that he had not.

83. When TFO Opelt asked Wilczewski where he got the money, Wilczewski said that he had saved it.

84. When TFO Opelt asked Wilczewski if he got the money from someone else, Wilczewski asked if he had to answer that question.

85. TFO Opelt advised Wilczewski that he did not have to answer any questions and reminded him that he was not in any trouble and that he was free to leave.

86. When TFO Opelt asked Wilczewski what he did for a living, Wilczewski said that he was unemployed.

87. TFO Opelt advised Wilczewski that agents were going to detain the subject property for further investigation, including examination by a canine.

88. TFO Opelt informed Wilczewski that he could accompany agents to the DEA office located within O'Hare if he wanted to and that he was free to board his flight to California.

89. Wilczewski said that he did not want to accompany agents to the DEA office.

  E. Canine Examination of the Subject Property

90. TFO Terranova utilized his certified narcotics detection canine, Madden, to examine the subject property.

91. Madden is currently five years old and TFO Terranova is Madden's first handler.

92. Madden is certified in the State of Illinois by the Chicago Police Department (most recently on October 2, 2018).

93. Madden was last certified prior to this investigation by the Chicago Police Department on November 29, 2017.

94. Madden is trained and certified to detect five odors: (1) marijuana, (2) cocaine, (3) heroin, (4) ecstasy, and (5) methamphetamine.

95. If at any time during a search Madden smells one of the five odors he is trained to detect, Madden will alert with a passive alert at the area where he smells the odor.

96. Madden's search/sniff of the subject property was conducted on September 5, 2018 at the garage parking area located within the Wintrust Building in Rosemont, Illinois (the "Wintrust garage").

97. At the time of the search/sniff at the Wintrust garage, there were vehicles, concrete pillars, miscellaneous discarded plastic bags, and pest traps in a caged in area.

98. TFO Terranova brought Madden into the Wintrust garage and gave him the command to search/sniff.

99. As Madden searched the Winstrust garage and neared the hidden bag that contained the subject property, TFO Terranova observed Madden sniff the air, focus his stare, and sit.

100. TFO Terranova recognized this behavior as a positive alert indicating Madden smelled one of the five orders he is trained to detect.

101. TFO Terranova did not recognize this behavior from Madden as indicating an interest in any other items, persons, or vehicles in the area.

    F. Seizure of the Subject Property for Forfeiture

102. At this time, Group 24 investigators seized the subject property for forfeiture per DEA guidelines governing asset forfeiture.

103. Wilczewski, Rafael, Quinonez and Adan all left with no further incident.

II. Additional Investigative Details

    A. Criminal History of Rafael

104. On February 28, 2017, Rafael was arrested by DEA Chicago as a result of the seizure of $14,500 in U.S. currency, and a small amount of cocaine and marijuana in Niles, Illinois.

105. Most recently, Rafael was arrested in May 2018 by the Rialto Police Department (California) while in possession of 10.87 kilograms of cocaine and $53,125 in U.S. currency.

III. Administrative Forfeiture Proceedings

106. On October 11, 2018, DEA initiated administrative forfeiture proceedings against the $10,000 in U.S. currency seized from Rafael, the $10,000 in U.S. currency seized from Quinonez, and the $9,900 in U.S. currency seized from Adan by mailing a Notice Letter and Notice of Seizure to all potential interest holders by certified mail.

107. As no timely or valid claims were filed in those administrative proceedings, DEA will issue Declarations of Administrative Forfeiture as to the $10,000 in U.S. currency, $10,000 in U.S. currency and $9,900 in U.S. currency.

108. On September 21, 2018, DEA also initiated administrative forfeiture proceedings against the subject property by mailing a Notice Letter and Notice of Seizure to all potential interest holders by certified mail.

109. In response to this notice, attorney Bradley Harris, of the law firm of Harris, Harris & Associates, P.C., on behalf of Rafael filed an online claim to the subject property with DEA on October 23, 2018.

110. Included with the online claim was a Verified Claim executed by Rafael and a copy of the Notice of Seizure issued by DEA.

111. On October 30, 3018, DEA referred this matter to the United States Attorney's Office in Chicago to initiate judicial forfeiture proceedings.

**First Cause of Action**

112. Plaintiff repeats and realleges the averments in paragraphs one through 111 as though fully set forth herein.

113. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for

13

a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq*. (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

114. Pursuant to 21 U.S.C. § 881(a)(6), "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [21 U.S.C. §§ 801-904], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of [thereof]" are subject to forfeiture to the United States. *Id*.

## Second Cause of Action

115. Plaintiff repeats and realleges the averments in paragraphs one through 111 as though fully set forth herein.

116. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, "dealing in a controlled substance" a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

117. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of 1956, 1957 or 1960 of [Title 18], or any property traceable to such property," is subject to forfeiture to the United States.

118. Pursuant to 18 U.S.C. § 1956(a)(3):

> Whoever, with the intent—
>   (A) to promote the carrying on of specified unlawful activity;

 (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
 (C) to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both…

119. The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

120. The list of offenses under § 1961(1)(A) are further defined as "racketeering activity," and include "any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.]" *See* 18 U.S.C. § 1961(1)(A).

### Third Cause of Action

121. Plaintiff repeats and realleges the averments in paragraphs one through 111 as though fully set forth herein.

122. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, interstate and foreign travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952, a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

123. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of 1956, 1957 or 1960 of [Title 18], or any property traceable to such property," is subject to forfeiture to the United States.

124. Pursuant to 18 U.S.C. § 1956(a)(3):

15

> Whoever, with the intent—
>  (A) to promote the carrying on of specified unlawful activity;
>  (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
>  (C) to avoid a transaction reporting requirement under State or Federal law,
> conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

125. The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

126. The list of offenses under § 1961(1)(A) are further defined as "racketeering activity," and include "any act which is indictable under . . . section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

127. Section 1952(a) describes the following as an indictable act:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
>  (1) distribute the proceeds of any unlawful activity; or
>  (2) commit any crime of violence to further any unlawful activity; or
>  (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity[.]

128. Section 1952(b) further describes "unlawful activity" as, "any business enterprise involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act)[.]". *See* 18 U.S.C. § 1952(b).

### Fourth Cause of Action

129. Plaintiff repeats and realleges the averments in paragraphs one through 111 as though fully set forth herein.

130. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to "dealing in a controlled substance," a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

131. Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c))" is subject to forfeiture to the United States. *See* 18 U.S.C. § 981(a)(1)(C)(2018).

132. The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

133. The list of offenses under section 1961(1)(A) are further defined as "racketeering activity," and include "any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.]" *See* 18 U.S.C. § 1961(1)(A).

**Fifth Cause of Action**

134. Plaintiff repeats and realleges the averments in paragraphs one through 111 as though fully set forth herein.

135. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952 ([i]nterstate and foreign travel or transportation in aid of racketeering enterprises), a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

136. Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c))" is subject to forfeiture to the United States. *See* 18 U.S.C. § 981(a)(1)(C)(2018).

137. The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

138. The list of offenses under section 1961(1)(A) are further defined as "racketeering activity," and include "any act which is indictable under . . . section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

139. Section 1952(a) describes the following as an indictable act:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
>   (1) distribute the proceeds of any unlawful activity; or
>   (2) commit any crime of violence to further any unlawful activity; or
>   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity[.]

140. Section 1952(b) further describes "unlawful activity" as, "any business enterprise involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act)[.]" *See* 18 U.S.C. § 1952(b).

**Prayer for Relief**

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1) That process issue for an arrest warrant *in rem* for the subject property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2) That due notice be given to all parties to appear and show cause why forfeiture of the subject property to the United States in accordance with the claims herein set forth should not be decreed;

3) That this Court enter a judgment of forfeiture for the subject property to the United States; and

4) That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

DATED this 18th day of January 2019.

JOHN R. LAUSCH, JR.
United States Attorney
For the Northern District of Illinois

By: *Jeffrey R. Borup*
JEFFREY R. BORUP
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
Desk: (312) 697-4087
Email: jeffrey.borup@usdoj.gov

Attorneys for Plaintiff
United States of America

| | |
|---|---|
| State of Illinois | ) |
| | ) ss. |
| County of Cook | ) |
| | ) |

## VERIFICATION IN SUPPORT OF COMPLAINT FOR FORFEITURE *IN REM*

I, Scott M. Opelt, declare under penalty of perjury the following:

1. I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been so employed since November 24, 2014.

2. My duties and responsibilities as a Task Force Agent with DEA involve investigation of alleged violations of the Controlled Substances Act, Title 21 of the United States Code.

3. I have read the foregoing complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief.

4. This statement is based upon my own personal knowledge as well as information I have received from other agents, persons, and documents; it does not include each and every fact known to me concerning this investigation, but is submitted for the limited purpose of establishing a basis to believe the property identified is subject to forfeiture.

Executed on this 22rd of January 2019, in Chicago, Illinois.

SCOTT M. OPELT
Task Force Officer
Drug Enforcement Administration